## ENTERPRISE RAILWAY EQUIPMENT CO. v. PULLMAN STANDARD CAR MFG. CO.

### No. 6422.

Circuit Court of Appeals, Seventh Circuit.

Feb. 26, 1938.

18

George I. Haight, and M. K. Hobbs, of Chicago, Ill., for plaintiff-appellant.

L. B. Mann, of Chicago, Ill. (L. K. Gillson, of Chicago, Ill., and E. W. McCallister, of Pittsburgh, Pa., of counsel), for defendant-appellee.

Before SPARKS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiff questions the propriety of a decree of the District Court finding invalid claims 10 and 13 of patent No. 1,537,050, and claim 9 of patent No. 1,537,051, both granted on May 5, 1925.[1] Each relates to improvements in railway car construction.

[1] Claims 10 and 13 of patent No. 1,537,050. Claim 10. In a car having the ends formed of lesser width than the central portion thereof, said ends having substantially vertically disposed straight corner posts, the combination with side top rail members extending longitudinally of the car and substantially in alinement with the aforesaid corner posts and secured thereto; of a plate secured respectively to the top rail member and corner post, said plate having horizontal and vertical offsets formed therein whereby the main section of the plate is disposed outwardly of the rest of the plate to secure increased width of the car; and ladder rungs mounted on the car between the aforesaid vertical offset and the end of the car and within the plane of said widened portion of the car.

Claim 13. In a dump car having end walls and body bolster, each side wall extending in the same vertical plane from a point approximately midway between the end of the car and the adjacent bolster to a corresponding point at the adjacent end of the car being inwardly offset a sufficient amount to accommodate ladder rungs within the plane of the main portion of the sidewall; and stakes on the inner sides of the side walls, said side walls being inwardly offset along their upper edges and having a top rail member secured thereto.

Claim 9 of patent No. 1,537,051. In a dump car, the combination with the end wall; of a side wall having the top thereof reinforced with a longitudinally extending member of angular section having one flange thereof substantially horizontally disposed and the adjacent flange thereto vertically disposed; a corner post defining the limits of the aforesaid respective side and end walls; a plate included in the side wall of the car and having a section secured to the aforesaid top member and corner post and extending from one to the other in the same

Campbell, the patentee, after some six earlier attempts along the same line, applied for and obtained the patents; the claims thereof, with which we are concerned, being substantially the same. In patent No. 1,537,050 he carried forward his efforts to build a useful hopper car of maximum capacity within the dimensional limits necessitated by operating conditions of railroads. He provided that the sides of the car should be applied to inside stakes, whereas common practice in the past had been to place the stakes on the outside. Yet he admitted that it was old in the art to. provide inside stakes. By placing the side. wall plates on the outside, he secured increased width of the interior without increasing that of the exterior. At the top he bent the side wall plates inwardly for attachment to the top rail which in turn was tilted or inclined in order that maximum capacity might be obtained in loading the car.

His side wall plate was "one integral piece of metal, offset or deflected inwardly adjacent the ladder rungs in order to provide a recessed panel within which the ladder rungs may be placed without projecting beyond the side of the car." By bending the side walls outwardly from near the top and the ends inwardly, he obtained increased width and consequent capacity, with room for safety appliances within the end recesses, without change in exterior dimensions. It was old to depress the side wall at the end of the car, but to utilize an integral side wall in so doing was new.

In patent No. 1,537,051 he disclosed the same conception; namely, to provide a car with an interior maximum width possible under given road clearances. His side wall he inclined upwardly and inwardly at the top and secured to the vertical flange on the top rail. He sloped it outwardly from a point about half way between the corner post and the bolster and then continued it in a straight line to a similar point at the other end of the car where it was again tapered similarly inwardly. Thus, by placing his stakes on the inside and the walls outside of them and extending the side walls outwardly from near the top to the bottom of the car and inwardly from a point midway between the bolster and the corner post at the end of the car, he achieved his purpose of larger capacity without increasing the dimensions of the car or changing its mechanical structure. Plaintiff also asserts novelty in the specific manner of attachment and riveting. But plaintiff admits that the combination, if amounting to invention over the then existing art, must be limited to the narrow and specific construction set forth in Campbell's patents. The District Court believed that there was no precise anticipation but that the teachings of the art were such as to negative invention and that Campbell, with the art before him, exercised only mechanical skill in adapting its teachings to his specific combination.

The Patent Office considered many citations, all of which have been reproduced in this record, and granted the patents over such references. Plaintiff has met with commercial success, asserting that Campbell's car has been adapted in some years to the extent of 100 per cent. of cars of such class purchased by railroads. But this claim is disputed, for the reason, as defendant says, it is based upon Campbell's conclusion as to whether the cars purchased were within the scope of his patents. Undoubtedly, however, the combination has been successful and largely useful. So plaintiff urges, in support of its contention of invention, the presumption of validity which attaches to all patents, reinforced and confirmed, as it says, by the distinction from voluminous prior art by the Patent Office and the later success of the car.

In the prior art we find that in the American Engineer and Railroad Journal for August, 1902, it was said that an ingenious method of increasing the cubical capacity without adding materially to the width had been shown by certain drawings of "Pittsburgh" coal cars. "At the brake end," the article stated, "the side planks are cut off at the first stake and set in sufficient distance to accommodate the hand holds, without projecting beyond the outer faces of the rest of the siding. * * In this way the width of the car is made six inches greater all along except at the brake end." These cars were made of wood. Thereafter, steel cars came largely into use.

In 1911, Streib, in patent No. 1,777,829, said that his invention had for its object the building of a car, which for a given

plane; and ladder rungs secured to the aforesaid section, said plate having the main section thereof offset adjacent the ladder rungs and adjacent the side top member thereby presenting a car of increased width throughout the length of the latter offset.

capacity ."will have the maximum width within the clearance limits allowed and yet permit the application of safety appli-. ances such as side ladders and hand holds * * * without reducing the width of the car throughout the entire length of its body and consequent reduction of cubic capacity." His design was embodied in steel cars made for the Woodward Iron Company, in which, between the bolster and the end of the car, the side wall was offset inwardly by the width of a Z-bar stake to provide space for the ladder. True, Streib's depressed end, providing space for the ladder, occupies twice the space actually necessary to accommodate the ladder; but surely it was not invention to reduce the area by one-half. A casual observer of Streib's car would see immediately that he had utilized twice as much space for the ladder as necessary.

Shortly thereafter the Virginian Railroad purchased similar cars, the side walls of which were sloped inwardly near the top to permit the angle bar top rail to be outside and thus make the cars "self-clearing" in dumping. Obviously, if the angle bar top rail was on the inside it would obstruct coal in dumping the load. In 1920 the C. & O. Railroad Company purchased cars similar to the Virginian cars, except in details not deemed important. Instead of using a Z-bar stake for making the offset the end-most side plate was bent to a Z-form at its inner edge and sloped at the top to fit the adjoining side sheet.

In April, 1921, Pilcher applied for patent No. 1,433,096 in which he disclosed a design for high capacity, wide bodied hopper cars in which he inclined the sides inwardly from the bolster to the end of the car, thus affording clearance space for the ladder. During the same year the Norfolk & Western built such a car.

Campbell on August 31, 1922, filed his application for patent No. 1,474,814, in which he used inside stakes, admitting that they had been used before, but claiming that he achieved a greater "capacity when the load is heaped * * * as compared with previous constructions even when inside stakes have been employed." Applications for the two patents in suit followed on April 4, 1923, and May 24, 1923, respectively.

Thus we find in the prior art that inside stakes were old; that various cars had been built with offsets which inevitably increased capacity; that, though in some or all of them the side pieces were not integral, they were made in two sections and were so united as in the end to be physically one, and that much of the prior art suggested offsets and inside stakes.

We find no basis for disagreement with Judge Barnes. True, a problem confronted Campbell which had not been completely solved previously by him or his predecessors. Yet he must be considered as one educated in the art of constructing such railroad cars. He was charged with full notice of the teachings of the art as disclosed to the public, and when he offered his solution of the problem of increasing the width without affording changes in frame construction and without going beyond the limits imposed by the necessities of operation of railroads, it seems to us, he exercised only the mechanical skill of one learned in his art. He was no nearer invention than was Scherzer when he constructed the double deck bascule bridge. Scherzer Rolling Lift Bridge Co. v. City of Chicago, 7 Cir., 11 F.2d 605. Nor was he any nearer the genius of the inventor than was Oglesby who carried forward the original thought of his predecessors in attaching a magneto to his automobile gas engine and achieved his specific result by eliminating one plate on the end of a crank shaft and by a slightly different location of the recognized essential circuit breaker. His actions, we said, were rather a mechanical readaptation of familiar devices. Briggs & Stratton Corp. v. Quick Action Ignition Co., 7 Cir., 93 F.2d 207. With what Campbell had before him, we agree with Judge Barnes, all he did was to give a somewhat different form to features which were already familiar and the desirability of which was recognized in previously constructed cars without giving to them any new function and without accomplishing by them any new result. He may have done his work better, but, as the Supreme Court said in Railroad Supply Co. v. Elyria Iron & Steel Co., 244 U.S. 285, 37 S.Ct. 502, 505, 61 L.Ed. 1136, "The 'mere carrying forward of the original thought, a change only in form, proportions, or degree, doing the same thing in the same way, by substantially the same means, with better results, is not such an invention as will sustain a patent.' "

True, the offset of Campbell was in a unitary side plate and this precise construction had not been used previously, but

his predecessors united the offset section firmly to the side plate and thus made the two integral in their final form. We cannot attribute invention to the obvious replacement of two firmly riveted parts by one part integral in character, both serving the same purpose and performing the same function. For practical purposes they are one. Bettendorf Co. v. Ohio Steel Foundry Co., 6 Cir., 56 F.2d 777, at page 778; Clipper Belt Lacer Co. v. E.-W. Co., 6 Cir., 237 F. 602 at page 605; Hulbert & Dorsey v. Bridgman, 297 F. 461 at page 463 (D.C.Del.). This court said in Milwaukee Bronze Casting Co. v. Avery et al., 7 Cir., 209 F. 616, at page 618: "Perry's sheet metal reflector is practically the same as Avery's, differing only in the material from which it is made and the two-piece flange, concentric with its axis. Ordinarily it is not invention to substitute a one-piece device for a two-piece device. It is only when some new result, not a mere difference in degree, is thereby obtained. Where the prior art already suggests the idea of a device as to form and character of operation and result, mere improvements as to the material used and as to durability and effectiveness do not attain to the dignity of invention."

■ True it is, also, that the top rail of Campbell was not found in Streib, but there were many sorts of top rails in the art, and the choice between them or the modification of one or more of them by Campbell, or even his own provision of a new top rail, it seems to us, was merely the act of the skilled mechanic experienced in the art.

■ Plaintiff insists that Campbell was delving only in the art relating to "dump cars of the hopper type, as distinguished from gondola cars which are essentially open-box flat-bottom cars with or without doors in the floors," and that, therefore, much of the cited art is not pertinent. But Campbell testified: "Any open top car could be classified generally as a gondola. Gondolas may be dump cars, sometimes called dump cars, frequently called hopper cars or hopper gondolas." He said that the cars of interest in the litigation were properly rated as gondola cars. And he told the Patent Office that, while he had described his improved construction in connection with a car of the hopper discharge type, "it will be understood that the same is not limited thereto, but may be applied to other types of cars, wherever it is desired to utilize the full permissible clearance in the construction of railway cars for the purpose of securing increased load-carrying capacity." Then, too, he collected royalties on gondola cars. His statements lead us to conclude that plaintiff is within the rule stated in Stearns & Co. v. Russell, 6 Cir., 85 F. 218, 224, where it was said: "To imply as elements of a claim parts not named therein for the purpose of limiting its scope, so that it may be accorded novelty, is contrary to a well-settled rule of the patent law." To the same effect is Ford Motor Co. v. Parks & Bohne, 8 Cir., 21 F.2d 943.

■ Plaintiff points to Campbell's "novel" inclined set-offs, claiming that their replacement of right angle set-offs of the art was such improvement as to contribute materially to the assertion of invention. But he failed to point out any advantage flowing from such substitution in form of construction. In Permutit Co. v. Graver Corp., 284 U.S. 52, 52 S.Ct. 53, 55, 76 L.Ed. 163, the court said: "The only normal inference from such silence is either that it was deemed immaterial * * * or that * * * it was not claimed because it lacked novelty." Campbell exercised the option of adhering to one form or trying the other. This was not invention. Caverly v. Deere, 7 Cir., 66 F. 305, at page 308; Torrey v. Hancock, 8 Cir., 184 F. 61, at page 68; Eddy v. Dennis, 95 U.S. 560, at page 570, 24 L.Ed. 363.

■ Plaintiff also relies upon Campbell's specific method of riveting the side wall to the verticle flange of the top rail, asserting that horizonal riveting is essential. But the choice of mechanical details in this connection does not appeal to us as invention.

■ We conclude, therefore, that if the prior art does not completely anticipate Campbell, what he learned therefrom was sufficient to teach him as a skilled car builder everything that he disclosed. Accordingly, the decree is affirmed.