### CLAUDE NEON LIGHTS, Inc., et al. v. RAINBOW LIGHT, Inc.

No. 4493.

District Court, E. D. New York.
April 15, 1932.

Bohleber & Ledbetter, of New York City (Edwin J. Prindle, Thomas Ewing, and William Bohleber, all of New York City, of counsel), for plaintiffs.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds and Leslie B. Young, both of New York City, of counsel), for defendant.

GALSTON, District Judge.

■ This is a patent suit in which infringement is alleged of letters patent No. 1,726,-107, to Gustav Ludwig Hertz, issued August 27, 1929, for an electric discharge tube.

The defenses are lack of invention and noninfringement.

The patent relates particularly to electric discharge tubes which have a positive column light for lighting purposes. The intended commercial use was for advertising signs.

The specification points out that, as was known in the prior art, in such discharge

tubes a gaseous filling of neon radiated a red color. It was also known that the addition of a drop of mercury to such neon filled tubes produced a blue color. It seems that when such tubes are illuminated, the heat volatilizes the mercury, and at a certain temperature the vapor pressure of the mercury increases, so that the mercury vapor participates in the discharge and the red color of the tube changes to blue. This desirable result is, however, not possible under all temperatures, for, as Hertz said: "Discharge tubes of this kind have the disadvantage that if for any reason the temperature of the tube becomes too low (for example by reason of a low temperature of the surrounding open air), the vapour pressure of the mercury may acquire such a low value that the mercury practically no longer takes part in the discharge and the blue mercury light changes to the red neon light."

Now it is the blue light which apparently is desired; and the discovery of Hertz was that the disadvantage of the neon-mercury filling of the tube is reduced or eliminated *"if instead of neon* some other rare gases are used, for example argon, but krypton and xenon also give favorable results." (Italics mine.)

The inventor continues: "According to the invention a gaseous filling is introduced into a discharge tube with positive column light, which gaseous filling comprises argon and mercury vapor. The gaseous filling may consist of argon, krypton, xenon and mercury vapor. Preferably *a gaseous filling of argon and mercury,* the argon pressure of which is above 4 millimeters of mercury will be used." (Italics mine.)

In addition to preserving the desirable characteristic blue color of the heated mercury in the gas filling of argon, the inventor states that a great advantage of such discharge tube "consists in that their operating voltage is lower than that of the discharge tubes having a positive column light and a neon mercury filling."

Claims 1 and 3 are in issue. They read:

"1. A discharge tube for positive column light, the gaseous filling of which comprises argon and mercury vapor."

"3. A discharge tube for positive column light, the gaseous filling of which consists of argon having a pressure above 4 millimetres of mercury pressure and of mercury vapor."

Though there is some contradiction in the proof, I find that at the time the two alleged infringing signs were made, and at all times

after the patent in suit issued, the defendant's practice was to fill its blue tubes, at first with a combination of argon and helium, and that at a later period such combination was changed to argon and neon. At no time since the patent issued did the defendant use only argon and mercury vapor.

Mr. Beck, the plaintiffs' expert, failed to establish that the gaseous filling of the alleged infringing tubes was only argon and mercury.

"XQ27 And suppose that there was argon in that tube and some other gas, would a spectroscope show up the presence of the other gas? A. It depends on the percentage of the other gas."

"XQ29 Suppose there was some neon in that tube and some argon and some mercury vapor, and you condensed the mercury vapor in this limited section. Now, when you apply a spectroscope would a spectroscope tell you of the presence of neon? A. It depends on how much neon is in there."

"RX68 In such a tube as these we have been talking about, consisting of a tube containing both argon and neon, I wish you would state what percentage of neon would have to be present in order for the presence of the neon to be apparent on the examination of the electrode glow. A. About 20 per cent. I do not know whether it is exactly 20, but around 20 per cent. you begin to see the glow of neon and the electrode."

In these circumstances, Mr. Beck's testimony leaves it entirely open as to whether in point of fact the alleged infringing tubes did or did not contain any neon.

As against this speculative and inconclusive testimony, defendant's witness Machlett said, and I find no reason for not accepting his statement: "So far as pure argon tubes are concerned, none have been made by the defendant since 1928."

I think the instruction of the patent was departed from both by the defendant and by the plaintiff as well. The teaching of the patent leads to the avoidance of the use of neon, but both plaintiff and defendant use neon in their blue tubes. In so doing they raise the operating potential and decrease the efficiency.

The specification says: "Discharge tubes according to the invention are capable of still producing mercury light at temperatures at which a discharge tube having positive light and filled with neon and mercury already produces neon light. This is a very remarkable phenomenon, as the exciting po-

tential of argon is lower than that of neon. One would therefore expect that at a temperature at which a neon mercury discharge tube produces neon light, an argon mercury discharge tube of all others would produce only argon light, whereas experiment discloses that at certain temperatures the contrary is the case."

The plaintiff urges that the claims in suit are infringed if argon is but part of the gas filling. Plaintiff argues that the term "comprises," as used in claim 1, implies that other gases may be present. There is nothing in the specification to justify such a reading. Claims 2 and 3 use the term "consists," the meaning of which cannot for a moment be doubted. To assert a verbal distinction between "comprises," as used in claim 1, and "consists," as used in claims 2 and 3, carries no conviction. That claim 1 limits the gaseous filling to one gas-argon seems to me to be an inescapable inference from the mere reading of the patent. If confirmation of this conclusion is necessary it is afforded by a critical study of the contents of the file wrapper.

In the specification as originally filed occurs this passage: "According to the invention a gaseous filling is introduced into discharge tubes, which gaseous filling consists of one or more of the gases argon, krypton and xenon and one or more of the metal vapours mercury and cadmium."

It seems to me that such language leaves no room for misinterpretation. Not only did the inventor specifically exclude neon, as I have noted, but he particularly described the gas or gases of which the gaseous filling in the discharge tubes should consist. This he made clear in the original claims.

Claim 1 of the application, as filed, read as follows: "1. A discharge tube for positive light, the gaseous filling of which consists of one or more of the gases argon, krypton and xenon and one or more of the metal vapors mercury and cadmium."

The claim was objected to in the first action of the Patent Office as alternative in form because of the expression "one or more." Thereupon the applicant canceled claim 1, and substituted: "1. A discharge tube for positive light operating with cold electrodes, the gaseous filling of which consists of at least one of the gases argon, krypton and xenon and at lease one of the metal vapors mercury and cadmium."

This claim having been rejected in view of British patent No. 17,036 of 1914 and British patent No. 138,643, the applicant, in his communication of November 16, 1927, argued: "Applicant claims an electric discharge tube containing *either* argon, krypton or xenon in combination with the vapor of mercury or cadmium. Obviously more than one of the *gases mentioned* may be employed in a tube with *either* mercury or cadmium or a mixture of the latter." (Italics mine.)

Thereupon the Examiner again pressed the objectionable alternative form of the claim in rejecting the claim. Whereupon the claim was canceled, and, in effect, claims 1 and 2 of the patent were substituted for the rejected claim.

Now claim 2 of the patent clearly embodies the combination of argon, krypton, and xenon with the mercury vapor, i. e., the multiple gases of the rejected claim, and constitutes one of the two alternatives mentioned in that claim; therefore it must follow from the foregoing history that claim 1 meets the other alternative of that claim, that is, the use of but a single gas with the mercury vapor. The claim defined argon then as the sole gas to be employed.

One of plaintiffs' experts, Mr. Schwartz, testified, in effect, that, if the total pressure in the tube is above the minimum of four millimetres, as suggested by Hertz, the argon, if present in sufficient quantity, would perform its function substantially as if it were the only gas beside the mercury vapor in the tube. However that may be, it was not that which Hertz claimed as his invention. Courts, of course, may not rewrite claims. American Writing Machine Co. v. Wagner Typewriter Co. (C. C. A.) 151 F. 576.

In view of this reading of the scope of the claims and of the essential nature of Hertz's invention, it becomes unnecessary for me to discuss in this opinion the exceedingly interesting question of the validity of the Hertz patent. Most of the testimony and most of the argument of counsel bear on this question, though I indicated at the trial that I was concerned primarily with the construction of the claims.

The defendant may have a decree dismissing the complaint.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.